IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JESSIE ROGERS, | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO. JKB-12-1012 |
| METROPOLITAN LIFE INS. CO., | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM**

*I. Background*

Plaintiff Jessie Rogers brought this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, claiming that she was wrongly denied disability insurance benefits under a policy issued by Defendant Metropolitan Life Insurance Company ("MetLife") to her former employer, Greenhorne & O'Mara, Incorporated. (Compl., ECF No. 1.) The parties have filed cross-motions for summary judgment, which have been thoroughly briefed. (ECF Nos. 26, 27, 30, 31.) No hearing is necessary. Local Rule 105.6 (D. Md. 2011). Defendant's motion will be granted, and Plaintiff's motion will be denied.

*II. Standard of Review*

Where a benefits plan gives discretion to the administrator to interpret the policy and determine a claimant's eligibility for benefits, as is true in this case, judicial review is limited to the issue of whether the administrator's determination constitutes an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008). Even if the reviewing court would have reached a different conclusion, the administrator's determination stands undisturbed

as long as it is reasonable. *Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 235 (4th Cir. 2012). Factors that may be considered by a court in evaluating the reasonableness of the administrator's decision include the following:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000), *cited in Fortier*, 666 F.3d at 235-36. *See also Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) ("an administrator's decision is reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence'" (citation omitted)).

## III. Undisputed Facts

Rogers began working in October 2000 as an Employee Services Specialist with Greenhorne & O'Mara. Her job was classified as sedentary. Her last day of work was February 6, 2008. (ML000814–815.)[1] On February 7, 2008, she underwent surgery for her degenerative lumbar disk disorder and received an L5-S1 laminectomy and fusion. (ML000739, ML000814–816.) She was approved for short-term disability benefits from February 7, 2008, to May 7, 2008, under the policy issued and administered by MetLife. (ML000697.) On April 17, 2008, she filed an application for long-term disability ("LTD") benefits. (ML000680–81.) She stated she had ongoing back and leg pain both before and after the surgery; the records indicate she had complications from the surgery. (ML000680, ML000808.)

---

[1] Citations to the administrative record filed by MetLife refer to the pages' Bates-stamped numbers.

She was approved for LTD benefits on April 22, 2008, effective May 7, 2008. (ML000659.) The letter of approval notified Rogers that she would continue to receive LTD benefits as long as she continued to meet the plan's definition of disability and to submit medical information to MetLife for review. (*Id.*) MetLife further notified her it would request medical information at reasonable intervals, indicating it would be Rogers's responsibility to ensure that her medical providers were submitting the information. (*Id.*) The letter also recited the applicable definition of disability, quoted here in pertinent part:

> [T]he definition of **Disabled** or **Disability** means that . . ., due to Sickness, or as a direct result of accidental injury:
> - You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
> - You are unable to earn:
> - During the Elimination Period and the next 24 months of Sickness or accidental injury, more than 80% of Your Predisability Earnings at your Own Occupation from any employer in your local Economy.

(ML000659.) After the 24-month period mentioned in the letter, Rogers would be subject to a different definition of disability, as set forth in the MetLife plan:

> - You are unable to earn:
> - [A]fter such period, more than 80% of your Predisability Earnings from any employer in Your Local Economy at any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

(ML001064.) "Local Economy" was also defined:

> [T]he geographic area:
> - within which You reside; and
> - which offers suitable employment opportunities within a reasonable travel distance.

(ML001064.)

MetLife received at regular intervals updated medical information from Rogers's health care providers. (*See, e.g.*, ML000370–374, ML000424, ML000434–448.) In July 2010, responses to these periodic requests for information indicated improvement in Rogers's

3

condition. Specifically, a pain management center noted in its records that Rogers received 30% to 40% relief in her condition after a caudal injection. (ML000380.) Also around that time, her doctor, Katrina McLellan, M.D., completed an attending physician statement ("APS") indicating Rogers was able to work full-time at a sedentary job level in any occupation but barring her from lifting or carrying more than twenty pounds; the doctor recommended that Rogers participate in a "work hardening program" and in vocational rehabilitation. (ML001135.) Likewise, on December 21, 2010, Richard Genato, M.D., who was a colleague of Dr. McLellan, examined Rogers and cleared her for sedentary work. (ML001150.)

In the Fall of 2010, MetLife commissioned a study, labeled an Employability Analysis and Labor Market Analysis ("EA/LMA") to determine Rogers's ability to obtain employment in her local economy based upon her functional capacity and her education, training, and experience. The EA/LMA indicated its reliance upon Dr. McLellan's APS showing Rogers's ability to return to work at the sedentary level. It noted Rogers's status as a high school graduate and her completion of additional courses related to human resources and computer operations, and it further noted Rogers's job skills were transferable. Utilizing a computer program that took into account the foregoing as well as the Dictionary of Occupational Titles and others sources of occupational information, the consultant performing the EA/LMA determined Rogers could perform the occupations of caseworker, controller, budget officer, employment interviewer, and risk and insurance manager. She further concluded that adequate numbers of jobs that Rogers could perform existed within a fifty-mile radius of her home in Odenton, Maryland. (ML000198–199.)

On December 1, 2010, MetLife sent Rogers a letter indicating that the most up-to-date information relating to her condition showed she could work at the sedentary level, that jobs were available in her local economy that she could perform, and that, therefore, she no longer

4

met the definition of disability under the plan; the letter further notified her that her LTD benefits were discontinued effective December 2, 2010. (ML001103–1105.) MetLife's decision was based upon the two records from July 2010 and the EA/LMA. It also took into account the fact that Rogers was receiving Social Security Disability Income ("SSDI") benefits, but MetLife determined that the more recent information regarding Rogers's ability to work was received over a year and a half after the SSDI award was made. Thus, the two decisions were based on different information as well as different standards. (*Id.*) The letter then advised Rogers of her appeal rights:

> Because your claim was denied in whole or in part, you may appeal this decision by sending a written request for appeal to MetLife Disability, PO Box 14592, Lexington KY, 40511-4592 within 180 days after you receive this denial letter. Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records, or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration. Upon request, MetLife will provide you with a copy of the documents, records, or other information we have that are relevant to your claim and identify any medical or vocational expert(s) whose advice was obtained in connection with your claim.
>
> MetLife will evaluate all the information and advise you of our determination of your appeal within 45 days after we receive your written request for appeal. If there are special circumstances requiring additional time to complete our review, we may take up to an additional 45 days, but only after notifying you of the special circumstances in writing. In the event your appeal is denied in whole or in part, you will have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.

(*Id.*)

In a letter dated January 10, 2011, Rogers responded to MetLife's December 1, 2010, notification of discontinuance of benefits and requested reconsideration of the decision. (ML000359.) She stated that she continued to be in pain, which seemed to be worse, and that she often spent the night in a chair because she was unable to lie in her bed. (*Id.*) She requested

that MetLife get in touch with Dr. Genato because he was the most knowledgeable about her condition. (*Id.*)

MetLife then sent by facsimile a letter to Drs. Genato and McLellan on March 2, 2011, and explained it was reviewing Rogers's file based on her appeal of MetLife's decision to terminate disability benefits. Attached to the letter was an independent medical consultant's report that the physicians were asked to review for comments. The letter said, "Please submit your comments on this report, specifically addressing but not limited to, Ms. Rogers [*sic*] impairments, restrictions and/or limitations. If you are not in agreement with this report, please submit clinical evidence in support of your conclusions. . . . If we do not hear from you by March 14, 2011, we will assume that you do not intend to respond and we will proceed with the decision on your patient's appeal." (ML000308.) Also on March 2, 2011, MetLife sent Rogers a letter indicating its request for information to Drs. Genato and McLellan (as well as a similar request to another physician, Dr. Carbone) and further indicating that it would proceed with a decision on her appeal after March 14, 2011, based on the information then in MetLife's files, but offered the possibility of an extension of time if it were requested. (ML000309.)

The independent physician consultant ("IPC") report, to which these letters referred, was completed on February 28, 2011. (ML000310–317.) It showed that the IPC reviewed many records by health care providers from January 17, 2008, through January 20, 2011. The IPC placed telephone calls to Dr. Genato's office on three consecutive days, February 23, 24, and 25, 2011, and left detailed messages requesting a return call; no return call was received before the report was completed, but the IPC stated he would prepare an addendum to the report should Dr. Genato return his calls. The IPC concluded that Dr. Genato had not cleared Rogers for full-time sedentary work until December 21, 2010. (ML000316.) The IPC also concluded that Rogers was subject to the following limitations:

> As to sitting tolerance, she would need to change positions, every 30 to 45 minutes, being allowed to stand and walk about for 10 to 15 minutes. Stand and walk tolerance—no more than 30 minutes at a stretch. Lift, carry, push, pull—10 pound maximum. Should avoid any loaded reach out and up. Able to undertake unloaded, repetitive upper extremity tasks. Should avoid—climbing, twisting, bending, stooping, crouching, kneeling, crawling.

(*Id.*)

On April 5, 2011, MetLife received from a disability consultant a labor market survey of positions in Rogers's local economy. (ML000287–295.) This consultant based her survey on the IPC's report and, apparently, upon the EA/LMA completed in the Fall of 2010. She determined that Rogers was not qualified for the earlier-identified positions of caseworker, controller, or budget coordinator, but that Rogers was qualified for the position of employment specialist in staffing. She further determined that this position was suitable for someone with Rogers's physical restrictions and would provide a commensurate wage to that of her employment with Greenhorne & O'Mara. Finally, the disability consultant determined that employment for this job was available within fifty to sixty miles of the Odenton, Maryland, area. Her report indicated that of the ten potential employers identified, seven were in Maryland (one in Bethesda, five in Columbia, and one in Baltimore), two were in Washington, D.C., and one was in Arlington, Virginia.

On April 18, 2011, MetLife sent a letter to Rogers, informing her that its review of its materials relating to her claim and appeal supported a slight modification of its earlier decision. (ML000280–286.) Specifically, the new termination date for her LTD benefits was December 21, 2010, which was the date Dr. Genato cleared Rogers for sedentary employment. Otherwise, the decision to terminate benefits was upheld based on MetLife's opinion that the medical records showed Rogers had the functional capacity to perform sedentary employment and that the labor market survey determined Rogers's local economy offered jobs for which she

was qualified and had the functional capacity to perform, and such jobs would provide an appropriate level of wages. The letter explained the standards applicable to Rogers's claim for LTD benefits and noted that the decision was based upon a review of the entire claim file including the materials received since the original termination date. It further noted that the IPC was unable to reach Dr. Genato on the telephone to discuss Rogers's condition in relation to her claim and appeal. It closed with the same, earlier-quoted paragraphs explaining her appeal rights.[2]

On May 27, 2011, an attorney retained by Rogers notified MetLife of his representation of Rogers and requested a copy of the records in Rogers's file. (ML000257–259.) On July 6, 2011, that attorney withdrew from representation of Rogers. The same attorney involved in the instant federal court litigation wrote MetLife on July 12, 2011, renewing the request for a copy of the claim file. (ML000251–253.) MetLife sent the record in late-September 2011 and, in the following month, granted Rogers's request for extension of time to file a formal appeal. (ML000240–241.) The formal appeal was submitted to MetLife in December 2011 (ML000227–235) with exhibits including a report to Rogers's counsel by a vocational consultant, Martin Kranitz, dated November 21, 2011 (ML000168–174); a radiologist's report to Dr. Genato on August 29, 2011 (ML000167); a functional capacity evaluation by Baltimore Work Rehab on August 24, 2011 (ML000135–166); and additional documentation from Dr. Genato's office from December 30, 2010, through October 14, 2011 (ML000112–134).

MetLife asked a different IPC to review the file, including all of the materials submitted by Rogers in her formal appeal. That report was completed January 4, 2012, and reflected conversation by the IPC with Dr. Genato on December 29, 2011. (ML000070–74.) The conversation was related as follows:

---

[2] A typographical error was present in the second letter of denial. The Court infers that "his" in the first paragraph of the letter's last two paragraphs should read "your." (ML000286.)

> [Dr. Genato] indicated he had no particular objection to the patient resuming work at least at the sedentary occupational level. He indicated there was no specific objective impairment precluding her from working at the sedentary occupational level with the ability to change positions as needed. He stated there were no adverse cognitive deficits as a result of her currently prescribed medications. He had not restricted her from driving a motor vehicle. He did not anticipate any significant change regarding the patient's functional status.

(ML000072–73.) The IPC also reviewed the functional capacity evaluations performed in December 2008[3] and on August 24, 2011. They showed, in the IPC's opinion, that Rogers

> was able to work at or near the sedentary occupational level. However, the reports also indicated Ms. Rogers' overall self-limiting, inconsistent and sub-maximal effort rendered the FCE results invalid. The conclusion of sedentary capacity may be an under estimation of her actual ability.

(ML00069.)

Following MetLife's receipt of the IPC's report, MetLife sent on January 5, 2012, a letter to Rogers's counsel, advising that the IPC's report had been forwarded to Rogers's physicians the same day with a request that the physicians review and comment on the report. (ML000042, ML000064.) MetLife further advised that it required a response by January 19, 2012, but again offered the possibility of an extension of time, if one were requested, to February 2, 2012. (*Id.*) Rogers's counsel replied on January 17, 2012, and informed MetLife that Dr. Genato required a $500 payment for a narrative report, that Rogers could not afford to pay that fee, and that Rogers, consequently, intended to rely upon Dr. Genato's previously submitted opinions and reports. (ML000027.)

On February 2, 2012, MetLife sent Rogers's counsel a letter notifying him that the previous decision terminating LTD benefits had been upheld. (ML000021–25.) The letter indicated MetLife had reviewed the entire claim file, including the additional materials submitted by Rogers and the IPC's January 2012 report. It also referred to another EA/LMA conducted by

---

[3] The IPC referred to an evaluation performed in December 2010, but this date seems to be in error; a functional capacity evaluation was performed in December 2008.

a Vocational Rehab Consultant ("VRC") who concluded that Rogers would be qualified to perform three, alternative, sedentary occupations, namely, personnel clerk, assignment clerk, and procurement clerk; the VRC further concluded that all three positions existed in reasonable numbers in Rogers's geographical area, including Anne Arundel County and surrounding counties. (ML000023–24.) The VRC opined that Rogers could earn a gainful wage in these three occupations in her local economy. The February 2, 2012, letter also noted the following:

> Upon request, MetLife will provide you with a copy of the documents, records, or other information we have that are relevant to this claim and identify any medical or vocational expert(s) whose advice was obtained in connection with this claim. You also have the right to bring a civil suit under Section 502(a) of the Employee Retirement Income Security Act of 1974.
>
> This review constitutes MetLife's final determination on Appeal in accordance with the Plan and federal law.

(ML000025. *See also* ML0001017–1021.)

Rogers's counsel acknowledged on February 6, 2012, receipt of MetLife's final decision, which constituted exhaustion of her administrative remedies; he also notified MetLife that Rogers intended to proceed with a lawsuit, and requested a complete copy of the administrative record. (ML000016.) The requested record was sent to counsel on February 17, 2012.[4] (ML000015.) This lawsuit was filed April 2, 2012. (Compl., ECF No. 1.)

## IV. Analysis

MetLife argues its determination that Rogers is no longer disabled within the meaning of the plan's terms "was reasonable and correct . . . [and] supported by voluminous medical evidence in the file." (Def.'s Mot. Summ. J. Supp. Mem. 15.) Rogers, on the other hand, argues that MetLife "failed to conduct a full and fair review and its decision is not based upon

---

[4] The letter was dated, apparently in error, February 17, 2011.

substantial evidence and therefore constitutes an abuse of discretion." (Pl.'s Mot. Summ. J. Supp. Mem. 23.) The Court concludes MetLife has the better argument.

Rogers's argument is flawed. She contends that MetLife relied "solely upon the opinions of its independent physicians and vocational consultants, and fail[ed] to adequately consider Plaintiff's medical condition, functionality and the results of two functional capacity evaluations." (*Id.*) The detailed letters setting forth MetLife's rationale for termination of LTD benefits did not rely "solely" on the IPCs or the vocational consultants. Considerable weight was given to the opinion of Dr. Genato—the treating physician whom Rogers herself had described as being the most knowledgeable about her condition—that Rogers was cleared to engage in sedentary employment. The IPCs' assessments were consistent with Dr. Genato's assessment, and the vocational consultants rightly relied upon the same assessment. Rogers's medical condition and functionality, quite obviously, underlay Dr. Genato's opinion, which, in turn, was the pivotal piece of evidence in the claim file. Rogers's assertion that MetLife failed to consider her medical condition and functionality is at odds with the evidence.

Rogers also presents the two functional capacity evaluations ("FCE") commissioned by her counsel as conclusive evidence that she cannot engage in sedentary employment, despite her treating physician's opinion that she is capable of sedentary employment. However, close examination of the FCEs reveals they do not help Rogers's case. One of those FCEs occurred in December 2008, two years before the initial decision to terminate benefits. That older FCE opined that Rogers had, at that time, a "tolerance of part time activity that falls within the parameters of the sedentary work category." (ML000448.) The physical therapist who conducted this FCE took issue with Rogers's approach to rehabilitation and pain management:

> Ms. Rogers reports the use of fair symptom management techniques. She relies heavily on passive techniques such as medication, activity avoidance, and resting. At nearly 11 months after surgery, she would benefit from regular performance of

11

cardiovascular, flexibility, and strengthening exercises. She would also benefit from a progressive increase in performance of household chores.

(*Id.*) The therapist also focused on the consistency of effort put forth by Rogers during the FCE:

> Ms. Rogers demonstrated deficits in physical effort that indicated actual abilities are greater than her willingness to tolerate activity during this evaluation. Her performance during the isometric grip tests was indicative of submaximal participation and she lacked physical indicators in postures and body mechanics that revealed maximal exertion. Additionally, she demonstrated signs of overreaction to test participation, crying during the carrying test. The crying itself was interpreted as an attempt to influence the evaluator, and ultimately the results of this test.

(*Id.*)

The FCE conducted on August 24, 2011, roughly two and a half years after the first FCE, noted the same submaximal effort put forth by Rogers:

> The results of this evaluation suggest that Ms. Rogers gave *a self-limited effort* . . . . It is difficult to assess Ms. Rogers's true limits secondary to self-limitation. Generalized submaximal effort . . . .

(ML000135.) This FCE concluded by noting Rogers's abilities fell within the sedentary category and noted that, based on the testing of Rogers that day, she would not be able to work more than a four-hour, seated-type job. (ML000136.)

The results of these FCEs were clearly compromised by Rogers's poor efforts, as noted by both evaluators. MetLife reasonably did not rely upon their conclusions that Rogers could work a part-time sedentary job. Such a restriction is inconsistent with Dr. Genato's opinion that Rogers was cleared for sedentary work, with no limitation to part-time employment.

Rogers also relies upon a report prepared by a vocational consultant, Martin Kranitz, to show that she cannot be gainfully employed in full-time sedentary work. Without any indication that he was qualified to render an opinion as to Rogers's functional capacity, Kranitz opined "that Ms. Rogers is not capable of performing full-time employment even at the sedentary level. The jobs which are listed in the labor market survey do not indicate part-time employment and

therefore would need to be eliminated on that basis alone." (ML000170.) This report was rightly discounted by MetLife as lacking authoritative weight.

Rogers additionally takes issue with the size of the geographic area in which potential employers may be located. (Pl.'s Mot. Summ. J. Supp. Mem. 25-26.) She dismisses any suggestion that she is able to commute a distance of fifty miles to work. (*Id.*) Rogers seems to have ignored the actual locations of potential employers compared to where she lives. The Court takes judicial notice that Odenton, Maryland, lies between Baltimore and Washington, D.C. It is approximately eighteen miles from downtown Baltimore, twenty-seven miles from downtown Washington, and fifteen miles from Annapolis.[5] The farthest potential employer identified in the second EA/LMA was located in Arlington, Virginia, roughly thirty-five miles from Odenton. In contrast, several potential employers were noted to exist in Columbia, Maryland, approximately fifteen miles from Odenton. Rogers's argument focuses on the worst-case scenario for a commute to work and ignores the reality that she lives in the heart of two well-populated metropolitan areas with many potential employers located well under fifty miles from her home. Her argument has no merit.

Rogers's last argument is that MetLife failed to comply with ERISA's appeal and notice requirements in the December 1, 2010, letter and the April 18, 2011 letter. (*Id.* 29-31.) Specifically, Rogers contends that the denial letters did not describe to Rogers what additional material or information was necessary for her to perfect her claim and did not explain why the additional material or information was necessary. (*Id.* 29 (citing 29 C.F.R. § 2560-503-1(g)(iii).) This contention is a red herring. MetLife did not base its decision on a lack of information or material. Its decision was based on a voluminous record, to borrow MetLife's term. Rogers fails to explain what information or material was lacking such that MetLife's decision was based on

---

[5] The Court refers to driving distances given by mapquest.com.

incomplete evidence. The letters of denial sent to Rogers fully informed her of MetLife's termination decision, the grounds for the decision, and the evidence on which it was based. And they also fully informed her of her appeal rights. Thus, they complied with the applicable regulations. Her final argument is without merit.

*V. Conclusion*

MetLife has demonstrated that its decision to terminate Rogers's disability benefits was a reasonable, principled exercise of its discretion and that its decision is supported by substantial evidence. No genuine dispute exists as to any material fact, and MetLife is entitled to judgment as a matter of law. A separate order will issue.

DATED this 15th day of May, 2013.

BY THE COURT:

/s/
James K. Bredar
United States District Judge